```
             IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF GEORGIA
                       COLUMBUS DIVISION
```

```
ERIC BROWN, Individually and as    *
Administrator of the ESTATE OF
LORETTA LEWIS,                     *

     Plaintiff,                    *

vs.                                *     CASE NO. 4:21-CV-71 (CDL)

MEDSCOPE AMERICA CORPORATION       *
and AVANTGUARD MONITORING
CENTERS, LLC,                      *

     Defendants.                   *
```

O R D E R

Loretta Lewis suffered from chronic obstructive pulmonary disease ("COPD"), a condition which substantially limited her major life activities. Because of this disability, she needed a reliable way to summon emergency medical personnel if she encountered a medical emergency while alone at home. Due to her medical condition and associated disability, she and her family were concerned that she would not be able to reach a telephone to call the public 9-1-1 service if she needed an ambulance. Having seen advertisements touting push button medallion-type devices worn around one's neck which would be on her person at all times and could-with the click of a button-promptly alert a service in case of an emergency, Lewis and her family thought this was just what she needed. The promotional information for the device led

Lewis and her family to believe that the service would provide, at a minimum, service that was at least substantially similar to what Lewis would receive from a standard 9-1-1 telephone call service. They understood that all the relevant information needed to assure that Lewis would receive a prompt and reasonable emergency response would be provided by the vendor to the emergency personnel. So, Lewis purchased a device from MedScope America Corporation.

While at home alone one day, Lewis felt that she could not breathe. She pressed the MedScope medallion, and a 9-1-1 certified operator employed by MedScope's partner, AvantGuard Monitoring Centers, LLC, answered Lewis's call. The operator notified the local 9-1-1 services agency of the call, who dispatched an ambulance to Lewis's home. But the operator did not discover that Lewis's home was locked, and the dispatched paramedics could not access the home until a firetruck arrived. According to the complaint, this delay caused Lewis to suffer an extended hypoxic event leading to serious brain injury that hastened her death three days later while in the hospital. Plaintiff Eric Brown, Loretta Lewis's son, now brings claims against Defendants MedScope and AvantGuard under Georgia's Fair Business Practices Act and under general tort law. Defendants filed motions to dismiss Plaintiff's complaint in its entirety. For the following reasons, those motions to dismiss (ECF Nos. 7 & 11) are denied.

2

MOTION TO DISMISS STANDARD

"To survive a motion to dismiss" under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The complaint must include sufficient factual allegations "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  In other words, the factual allegations must "raise a reasonable expectation that discovery will reveal evidence of" the plaintiff's claims.  *Id.* at 556.  But "Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because 'it strikes a savvy judge that actual proof of those facts is improbable.'" *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 556).

FACTUAL ALLEGATIONS

The Court summarizes the facts alleged in Brown's complaint in greater detail here, given that these allegations, which must be accepted as true, are the sole source from which the Court must ascertain whether the asserted claims are plausible.

When Lewis purchased her MedScope medallion, she entered into a contract with MedScope obligating MedScope to provide her with both the medallion and a medical alarm monitoring service.  Compl.

3

¶ 6, ECF No. 1. Specifically, MedScope represented that its system was intended for individuals with disabilities who may have trouble calling 9-1-1 directly in the event of a medical emergency. When the customer pressed a button on the medallion, the device was designed to initiate a voice call to a 9-1-1 certified response operator. Because of her underlying medical condition, particularly her COPD, Lewis and her family determined that she needed this kind of emergency notification system. *Id.* ¶¶ 10, 92, 94. It is reasonable to infer from the allegations that she believed this system was a matter of life and death, not just a convenience, and that MedScope intended to create this impression.

Prior to purchasing the system, Lewis and her son, Eric Brown, studied MedScope's website and viewed informational videos and tutorials about MedScope's devices. *Id.* ¶ 11. One of these videos stated that MedScope would "send someone immediately" and "contact [the customer's] physician" if alerted by a customer. *Id.* ¶ 17. The videos also represented that "MedScope monitoring personnel are highly skilled representatives and are on call 24 hours a day 7 days a week." *Id.* ¶ 19. MedScope's website claimed that calls would be answered by MedScope's 9-1-1 certified response operators, though these calls were actually answered by 9-1-1 certified response operators employed by AvantGuard. *Id.* ¶ 23.

Lewis activated her MedScope device on December 11, 2019, and told the operator that she could not breathe. *Id.* ¶¶ 39, 41. The

4

operator stated that they worked with the "MedScope Monitoring Center" despite actually working for AvantGuard. *Id.* ¶¶ 42-43. The operator relayed the emergency call to the public 9-1-1 service. But the AvantGuard/MedScope operator allegedly omitted several important pieces of information. Regarding Lewis's condition, the operator informed the 9-1-1 dispatcher that Lewis simply was "having trouble breathing" instead of accurately reporting that she "cannot breathe." *Id*. ¶¶ 44-45. And the operator did not mention her underlying medical condition of COPD. *Id.* ¶ 110. The Avant Guard/MedScope operator also did not inform the 9-1-1 dispatcher of any obstacles that the paramedics may encounter in trying to enter Lewis's home so that they would be fully prepared to reach Lewis immediately upon their arrival. Specifically, the operator did not inform the dispatcher that Lewis was home alone. *Id*. ¶ 46. The operator also did not notify the dispatcher that the doors to her home were locked, having failed to even ask Lewis that question. *Id.* ¶¶ 47-48. Plaintiff alleges that had a call been made directly to the official 9-1-1 dispatch service, the dispatcher would have made those inquiries of the caller.

Emergency medical services ("EMS") were dispatched approximately three minutes after Lewis alerted MedScope and Avantguard, but EMS could not access Lewis's house because the doors were locked. *Id.* ¶¶ 52-55. EMS was not equipped to enter

5

a locked home and relayed this information to 9-1-1, which dispatched a firetruck twelve minutes later. *Id.* ¶ 56. The fire crew gained access to Lewis's home and found Lewis laying on the floor barely breathing. *Id.* ¶¶ 58-59. Lewis was hospitalized and died three days later of an anoxic brain injury. *Id.* ¶¶ 67-68.

## DISCUSSION

Plaintiff asserts two causes of action in his complaint. He maintains that Defendants violated Georgia's Fair Business Practices Act and Georgia's Unfair and Deceptive Practices Towards the Elderly Act by misrepresenting the quality of MedScope's services. He also alleges a separate claim for negligence claiming that Defendants breached a tort duty owed to Lewis independent of any contract with her. Defendants seek dismissal of both claims. They argue that Defendants' alleged conduct is not covered by the Fair Business Practices Act and that any violation did not proximately cause Lewis's death. They also deny that they owed Defendant a duty of ordinary care. Keeping in mind that at this stage of the litigation the Court must accept Plaintiff's factual allegations as true and construe any reasonable inferences in Plaintiff's favor, the Court analyzes each claim in turn to determine whether Plaintiff's claims are "plausible," not whether Plaintiff will likely prevail.

I. **Fair Business Practices Act Claim**

Defendants first argue that the Fair Business Practices Act does not apply because Defendants' alleged misconduct occurred in a private transaction beyond the scope of the Act.[1]  The Fair Business Practices Act was enacted to "protect consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of any trade or commerce[.]"  O.C.G.A. § 10-1-391(a).  It "does not encompass suits based upon allegedly deceptive or unfair acts or practices which occur in an essentially private transaction."  *Lynas v. Williams*, 454 S.E.2d 570, 573 (Ga. Ct. App. 1995).  "Unless it can be said that the defendant's actions had or has potential harm for the consumer public the act or practice cannot be said to have 'impact' on the consumer marketplace and any 'act or practice which is outside that context, no matter how unfair or deceptive, is not directly regulated by the [Act].'"  *Id.* (quoting *State ex rel. Ryles v. Meredith Chevrolet, Inc.*, 244 S.E.2d 15 (Ga. Ct. App. 1978)).  "When a

---

[1] AvantGuard claims that Plaintiff cannot bring a Fair Business Practices Act claim against it because it did not make any false statements on which Lewis relied and because Lewis did not even know about AvantGuard's existence when Lewis purchased MedScope's device.  But Plaintiff correctly points out that "[a]ny intentional violation [of the Act] by a corporation. . . shall be deemed to be also that of the . . . agents of the corporation . . . who knew or should have known of the acts constituting the violation and who directly authorized, supervised, ordered, or did any of the acts constituting" the violation.  O.C.G.A. § 10-1-405(c).  Plaintiff has sufficiently alleged that AvantGuard was MedScope's agent, knew or should have known of MedScope's alleged violations, and actively participated in or authorized these violations.

7

'consumer' suffers damage as the result of an unfair or deceptive act or practice which had or has potential impact solely upon him and which is not and could not be a source of damage to any other member of the consuming public," proceeding under the Act does not serve a public interest. *Id.* (quoting *Zeeman v. Black*, 273 S.E.2d 910, 915 (Ga. Ct. App. 1980)).

"In analyzing whether a defendant's allegedly wrongful activities are in violation of the [Act] to protect the public or an 'isolated' incident not covered under the statute," there are two determinative factors: "'(a) the medium through which the act or practice is introduced into the stream of commerce; and (b) the market on which the act or practice is reasonably intended to impact.'" *Zeeman*, 273 S.E.2d at 915 (quoting *Meredith Chevrolet*, 244 S.E.2d at 18). "[O]ffering a product for sale by opening one's door to the general public triggers the prohibitions of the [Act] if a deceptive act or practice is involved." *Marrale v. Gwinnett Place Ford*, 609 S.E.2d 659, 664 (Ga. Ct. App. 2005).

Plaintiff's allegations clearly describe a transaction that would fall under the Act's protection. Plaintiff claims that MedScope publicly advertised its services through Youtube and MedScope's website. Plaintiff alleges that statements made in those public advertisements were deceptive and induced Lewis's purchase of MedScope's device. As such, Plaintiff's advertisement and sale of Lewis's device occurred within the consumer

8

marketplace. The next question is whether Plaintiff sufficiently alleges that Defendants made false and misleading representations that caused a cognizable injury, which would support a plausible claim under the Act.

To state a claim under the Act, a plaintiff must demonstrate a violation of the Act, causation, and injury. *Ussery v. Goodrich Rest., Inc.*, 800 S.E.2d 606, 611 (Ga. Ct. App. 2017). Generally, "proof of causation requires a showing of reasonable reliance." *Raysoni v. Payless Auto Deals, LLC*, 766 S.E.2d 24, 25 n.2 (Ga. 2014) (citing *Tiismann v. Linda Martin Homes Corp.*, 637 S.E.2d 14, 18 (Ga. 2006)). General statements that "are so subjective in nature and so lacking in specificity as to any claim of workmanlike standard as to preclude a reasonable person in like circumstance from harboring any genuine reliance thereon as to any particular quality of work that would be accomplished in the future" are considered "puffing" and cannot form the basis of a Fair Business Practices Act claim. *Lynas*, 454 S.E.2d at 574.

Defendants argue that Plaintiff does not sufficiently allege that Defendants' advertising included false statements or misleading business practices upon which Plaintiff's mother reasonably relied. Plaintiff responds by pointing out allegations in the complaint that Defendants misrepresented that they would provide "quick[]" service, "triage the customer's needs and location" and "dispatch the appropriate local agency to handle the

9

call." Compl. ¶ 73. Plaintiff's complaint further alleges that, notwithstanding these representations, Defendants did not triage Lewis's needs and location and did not dispatch a fire crew, which was needed to access Lewis's home. Thus, Plaintiff has alleged that Defendants did not do what they said they would do. And the clear inference from their allegations is that Lewis is not the only likely victim of these kinds of misrepresentations. If the evidence does not support these allegations, the Court will readdress this issue at summary judgment, if appropriate. But at this stage, the Court is persuaded that a plausible claim has been alleged.

The Court rejects Defendants' contention that these alleged misrepresentations were mere "puffing" and could not reasonably be relied upon as a matter of law. While some of Defendants statements taken in isolation may be considered puffing, others were not and when considered as a whole the Court finds that several material alleged misrepresentations could plausibly support a claim under the Act. For example, MedScope's claims that it would "triage the customer's needs and location" and "dispatch the appropriate local agency to handle the call" are sufficiently specific and detailed and do not constitute puffing. Compl. ¶ 73.

When Plaintiff's complaint is reviewed in its totality, giving Plaintiff the benefit of reasonable inferences and not

10

cherry-picked by astute lawyers who make no allowance for inferences at all, it alleges that Defendants targeted vulnerable persons who needed a product that could summon emergency medical services when they were in dire need of those services. To get anyone to buy the product, Defendants represented that their product was at least substantially similar to existing public 9-1-1 service. They further suggested that it was better suited to the needs of disabled persons than traditional 9-1-1 services because it did not require the customer to make it to the phone to dial 9-1-1 in an emergency. They could simply push the button. Defendants' operators would obtain all the necessary information from the customer when the call was made to provide the paramedics with everything they needed in preparation for their treatment of the customer. And the operators would do so in a manner that would reasonably ensure that the customer would receive the paramedic care in a reasonably prompt manner, but at least as quick as the customer would receive a response if the customer had not bought the product and called 9-1-1. Yet Defendants did not even relay Lewis's precise medical complaint, which would be the first essential step in a basic triage. And they failed to ascertain whether there was anyone home who could let them in upon their arrival so they could notify the 9-1-1 dispatcher that another agency may need to be dispatched to help the paramedics get inside the house. Plaintiff further alleges that had Lewis received the

11

care Defendants represented she would receive, she would have been reached sooner, the hypoxic event would have been shorter, and she would likely have survived.  If Plaintiff can prove that Defendants directed the alleged misrepresentations upon which Lewis relied into the marketplace and that these misrepresentations proximately contributed to her death, then their conduct could subject them to liability under the Fair Business Practices Act.  Defendants' motions to dismiss Plaintiff's Fair Business Practice Act claims are therefore denied.[2]

## II. Negligence Tort Claim

Defendants also seek to dismiss Plaintiff's negligence claim, arguing that they did not owe a duty to Lewis independent of the contract.  Specifically, MedScope maintains that it only owed a contractual duty to Lewis and that Plaintiff cannot bring a negligence claim based solely on the breach of that contractual duty.  AvantGuard acknowledges that it had no contract with Lewis but argues that it cannot be liable because it did not increase Lewis's risk of harm and Lewis did not detrimentally rely on AvantGuard's performance. "Although a breach of contract does not always give rise to an action for negligence, such an action will

---

[2] Because Plaintiff's Fair Business Practices Act claim survives, Plaintiff's claim under the Unfair and Deceptive Practices Towards the Elderly Act must also survive.  That Act provides for liability for those individuals or entities responsible for Fair Business Practices Act violations involving elderly or disabled individuals.  O.C.G.A. § 10-1-851.

12

lie 'if in addition to violating a contract obligation [the breach] also violates a duty owed to plaintiff independent of contract to avoid harming him.'" *Anderson v. Sears Roebuck & Co.*, 664 S.E.2d 911, 914 (Ga. Ct. App. 2009) (alteration in original) (quoting *Orkin Exterminating Co. v. Stevens*, 203 S.E.2d 587, 590 (Ga. Ct. App. 1973)). Under Georgia law, "where defendant's negligence ends merely in non-performance of the contract and where defendant is not under any recognized duty to act apart from contract, the courts generally still see no duty to act affirmatively except the duty based on-and limited by-defendant's consent." *Stevens*, 203 S.E. 2d at 591.

Plaintiff argues that Defendants owed an independent duty to Lewis because they assumed responsibility for providing Lewis with emergency services and Lewis relied on Defendants' assumption of that duty to her detriment. An independent tort duty between parties to a contract "may be found because of the relationship between the parties, or because of defendant's calling or because of the nature of the harm." *Stevens*, 203 S.E.2d at 590. Generally, "[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or

13

(b) the harm is suffered because of the other's reliance upon the undertaking."[3] Restatement (Second) of Torts § 323.

MedScope tries to frame Plaintiff's claim as limited to a failure to perform contractual duties, which is not actionable in tort under Georgia law. *See Stevens*, 203 S.E.2d at 591 (concluding Defendant termite company's failure to properly treat the premises was not actionable because the deficient treatment did not actively injury plaintiff but rather simply failed to cure the already existing termite problem). But this construction of Plaintiff's complaint is overly-narrow and disregards the corollary principle under Georgia law that "where nonperformance or inaction is of such a type as to create an unreasonable risk of harm to others, even non-performance of a contract duty . . . may give rise to a tort action." *Id.*

The Court also finds MedScope's reliance upon *Monitronics Int'l, Inc. v. Veasley*, 746 S.E.2d 793 (Ga. Ct. App. 2013), unpersuasive. *Monitronics* actually cuts against MedScope's position, not in favor of it. In *Monitronics*, the plaintiff

---

[3] Plaintiff asserts that AvantGuard is liable under the Restatement (Second) of Torts § 324(A). Under this provision, "[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

14

homeowner was sexually assaulted by an intruder concealed in her home after the defendant home security company gave her misinformation about how many times and why her home alarm triggered during the day.  *Id*. at 800.  The Georgia court held, however, that the defendant owed a duty in tort because the defendant's actions in calling the homeowner and giving her misinformation constituted extracontractual duties the defendant was not obligated to perform.  *Id*.  The Georgia court noted that it was not deciding whether the defendant was liable for negligently performing its duties under the contract.  *Id.* at 799 n.5.  And the holding in *Monitronics* certainly does not support MedScope's argument here.

To reiterate what the Court stated earlier in its analysis of Plaintiff's Fair Business Practices Act claim, MedScope promised Lewis, a vulnerable and disabled person, that it would provide emergency services that were comparable to (and likely better than) those she would receive by calling 9-1-1 directly.  Lewis relied on MedScope's representations by purchasing its services and activating the device instead of calling 9-1-1 when she experienced a medical emergency.[4]  Lewis also relied on AvantGuard's services

---

[4] Under Georgia law, reliance under the Restatement (Second) of Torts § 324A(c) requires a "change in position."  *Hutcherson v. Progressive Corp.*, 984 F.2d 1152, 1157 (11th Cir. 1993).  Lewis clearly changed her position to her detriment by opting to purchase Defendants' services and relying on those services instead of calling 9-1-1 directly or purchasing an emergency assistance device from another company.

15

because an AvantGuard operator answered Lewis's call and undertook the duty to act as Lewis's voice to 9-1-1. Lewis's reliance was to her detriment, as Plaintiff alleges that 9-1-1 did not send a fire crew to Lewis's house immediately because Defendants were negligent in failing to ask Lewis questions that 9-1-1 would have asked Lewis. Specifically, Plaintiff alleges that, if Lewis had called 9-1-1 directly, 9-1-1 would have asked her if her doors were locked and would have sent a fire crew to Lewis's house upon learning that Lewis "couldn't breathe." Plaintiff thus adequately alleges that Defendants owed a duty of care to Lewis by assuming responsibility for providing Lewis with necessary emergency services, Lewis relied on Defendants' assumption of that duty, and that Defendants breached that duty and harmed Lewis by negligently failing to act as a reasonable 9-1-1 operator would if Lewis called 9-1-1 directly. Defendants' motions to dismiss Plaintiff's negligence claim are denied.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss (ECF Nos. 7 & 11) are denied. A Rules 16/26 Order shall be issued.

IT IS SO ORDERED, this 17th day of March, 2022.

S/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA