```
           IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF GEORGIA
                    COLUMBUS DIVISION
```

ERIC BROWN, *Individually and as*     *
*Administrator of the Estate of*
*Loretta Lewis*,                       *

    Plaintiff,                     *

vs.                                    *
                                                   CASE NO. 4:21-CV-71 (CDL)
MEDSCOPE AMERICA CORPORATION          *
and AVANTGUARD MONITORING
CENTERS, LLC,                          *

    Defendants.                    *

## O R D E R

Plaintiff's mother, Loretta Lewis, subscribed to MedScope America Corporation's personal emergency response system. While at home alone, Lewis could not breathe, so she activated the system. Although an emergency response system operator responded to her call and asked the local 911 service to dispatch an ambulance, the emergency response system operator did not notify the local 911 service or Lewis's emergency contacts when she lost contact with Lewis; the operator also failed to tell the local 911 service that Lewis was home alone with the doors locked. The paramedics had to wait for a fire crew to access the house, delaying emergency treatment by at least eighteen minutes. Lewis went into cardiac arrest and died three days later.

Plaintiff brought this action against MedScope under Georgia's Fair Business Practices Act and Georgia's Unfair and Deceptive Practices Towards the Elderly Act. He also asserts negligence claims against MedScope and the company it contracted with to monitor Lewis's alert system, AvantGuard Monitoring Centers, LLC. Defendants seek summary judgment on all of Plaintiff's claims. As discussed below, genuine fact disputes exist on all of Plaintiff's claims, so the Court denies both summary judgment motions (ECF Nos. 52 & 57).

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, the record reveals the following facts.

Loretta Lewis suffered from chronic obstructive pulmonary disease, which her medical providers managed with breathing treatments like an inhaler and supplemental oxygen. Because of her medical condition, which substantially limited her major life activities, Lewis and her family were concerned that Lewis might have a medical emergency if she was left at home alone. During a 2019 medical appointment, a nurse recommended that Lewis consider obtaining a medical alert device. Lewis and her son, Eric Brown ("Eric") researched different medical alert device systems on the internet. Eric found a website and YouTube video for MedScope's medical alert systems. MedScope provides medical alarm pendants to its subscribers, most of whom are elderly and/or disabled. Smith Dep. 97:18-98:5, ECF No. 71. MedScope asserts that it is not a "direct to consumer" agency and that it only directs its marketing to healthcare agency case managers who refer their patients to MedScope—not to potential subscribers. But it is undisputed that MedScope's website and YouTube video are available to the general public.

Eric and Lewis watched a video that MedScope posted to YouTube in 2013. The video's description tells viewers: "Watch this video

3

to see how our Medical Alert Systems work and how they can benefit your life. Visit http://www.medscope.org/ to learn more today." Pl.'s Resp. to Defs.' Mot. Summ. J. Ex. 1, Screenshot of YouTube Landing Page, ECF No. 79-3 at 2.[1] In the video, a white-haired lady falls and activates a medical alert pendant, which causes a device in her home to beep. Pl.'s Resp. to Defs.' Mot. Summ. J. Ex. 1, MedScope Personal Emergency Response Systems Video, ECF No. 79-3 (on file with the Court). An operator identifying herself as "MedScope America" immediately responds and asks the lady if she is all right. *Id.* The lady says that she fell and thinks she broke her arm, and the operator replies, "we'll send someone immediately, and we'll contact your physician." *Id.* The video then states that a "MedScope Emergency Response System" allows people with medical or age-related concerns "to get help at once in the case of an emergency," and it explains how a user can install and test the system. *Id.* It further states, "MedScope monitoring personnel are highly skilled representatives and are on call twenty-four hours a day, seven days a week. When an alert signal is received, they have access to up-to-date medical records, as well as current phone numbers for all emergency contacts and

---

[1] MedScope pointed to evidence that the YouTube video is for an obsolete device, but MedScope does not dispute that the video was available on YouTube when Eric and Lewis saw it or that its title is "MedScope Personal Emergency Response Systems." Based on the Court's review of the video, there is no clear reference to a specific product model and no disclaimer that the featured model is obsolete.

4

the preferred physician." *Id.* The video states that viewers with questions should contact MedScope via telephone. *Id.* Nothing on the landing page or in the video states that the video is only for case managers or that potential MedScope subscribers should not watch or rely upon it.

Lewis and Eric also reviewed a "Frequently Asked Questions" document on MedScope's website. The FAQ states: "Calls are answered by our 9-1-1 certified response operators who dispatch help as needed." Pl.'s Resp. to Defs.' Mot. Summ. J. Ex. 2, Information About MedScope's PERS Devices and Services 2, ECF No. 80-4 [hereinafter MedScope FAQs].[2] It also states that the "response operators are located at monitoring centers in North Carolina and Utah," that emergency personnel "are dispatched from local first responder organizations," and that "If our operator cannot establish communication, we will dispatch help and notify emergency contacts." *Id.*

---

[2] MedScope does not dispute that Plaintiff's Exhibit 2 is an accurate depiction of an FAQ page as it existed on MedScope's website or that a MedScope representative agreed that it was the 2019 version. MedScope argues that the FAQ page was updated in 2016 to change the phrase "Calls are answered by our 9-1-1 certified response operators" to "calls will be handled by our response operators." But the evidence MedScope cited in support of this assertion does not establish that there was a permanent change to the FAQs in 2016. *See* Def.'s Reply in Supp. of Mot. Summ. J. Ex. A, FAQ Composite Exhibit, ECF No. 84-4 (attaching six FAQ pages published in 2016; none of the FAQ pages is clearly dated, and five of the six refer to "9-1-1 certified response operators"). MedScope also asserts that the FAQ page was intended for case managers, not end users, but it does not dispute that the FAQ page was publicly available on the internet.

5

Based on their review of the YouTube video and MedScope's website, Lewis and Eric decided that Lewis should obtain a medical alert pendant from MedScope. Lewis worked with a case manager from a local healthcare provider to obtain a MedScope pendant using her Medicaid benefits. On August 19, 2019, Lewis signed a subscriber agreement with MedScope for a mobile pendant personal emergency response system. The agreement stated that MedScope would provide continuous, two-way voice monitoring of signals from Lewis's pendant. Pl.'s Resp. to Defs.' Mot. Summ. J. Ex. 10, MedScope Agreement 1–2, ECF No. 79-12 at 3-4. It further stated, "Upon receiving a signal from the PERS, MedScope shall use reasonable efforts to orally notify the appropriate emergency agency or other persons designated on the Client's Subscriber forms, by telephone, advising of the existence and nature of such signal." *Id*. at 2, ECF No. 79-12 at 4. The agreement lists Lewis's emergency contacts as her son Eric and her granddaughter Tiffany Brown, and it contains their phone numbers. *Id*. at 1, ECF No. 79-12 at 3. Defendants note that a subscriber can provide information about how to access the subscriber's premises, although they acknowledge that neither the referral sent by Lewis's case manager nor the subscriber agreement contained such information.

Under the subscriber agreement, MedScope reserved "the right to appoint an agent to perform its monitoring service obligations."

*Id.* at 2, ECF No. 79-12 at 4.. MedScope entered a "Dealer Agreement" with AvantGuard, under which AvantGuard agreed to provide monitoring services for MedScope's subscribers. Bailey Decl. Ex. A, Dealer Agreement § 1, ECF No. 52-3 at 7. The agreement provides that AvantGuard shall "monitor Signals received from [the MedScope subscriber's] System 24/7." *Id.* § 6(b). When it receives a "Signal from a Subscriber's System," AvantGuard "shall make commercially reasonable efforts to transmit notification of the Signal promptly to the First Responders and the persons whose names, telephone numbers, e-mail, SMS and other electronic addresses are set forth on the notification instruction received by AvantGuard as to each Subscriber." *Id.*

When a MedScope subscriber presses the button on her medical alert pendant, MedScope connects the device to AvantGuard's call center and provides AvantGuard with any information that the subscriber has provided to MedScope (e.g., name, address, and emergency contact information). AvantGuard operators are instructed to state that they are with MedScope and ask the subscriber what kind of assistance they need. AvantGuard then contacts the subscriber's local 911 center, and the local 911 center dispatches first responders. The AvantGuard operator typically waits on the line with the subscriber until help has arrived, then the operator notifies the subscriber's emergency contacts.

7

On December 11, 2019, Lewis was home alone with the doors locked. She pushed the button on her medical alarm device at 11:42:08 A.M. At 11:43:16 A.M., Lewis was connected with an AvantGuard operator, Naomi Greenig, over the two-way communication system. The present record does not contain any details about the call; although AvantGuard has a practice of recording all calls and retaining all recordings, it lost the recording of Lewis's call. Greenig had been instructed to state that she was with MedScope. She answered Medscope alarm calls by stating that she was with Medscope and asking if the subscriber needed help. Greenig was able to access Lewis's account, which contained Lewis's address and the names of her emergency contacts.[3]

Greenig, who was not a certified 911 operator, entered the following information on her log: "Help is Needed – Medical Emergency," "can't breathe," and Lewis's address. Pl.'s Resp. to Defs.' Mot. Summ. J. Ex. 4, Detailed Activity Report 1, ECF No. 79-6. At 11:43:38 A.M., Greenig contacted Columbus 911 and informed the 911 operator that she was calling from MedScope about a medical mobile alarm. MedScope's Mot. Summ. J. Ex. C, 911 Call Recording, PD009 12-11 . . . Call Tkr 1 Ph A OR22-0919-4113, ECF

---

[3] Defendants note that Lewis's account did not include any information about a keyholder or how to access her residence because Lewis did not provide such information to MedScope. Defendants did not point to any evidence that Defendants asked Lewis—either via a form, through the case manager, or through the installer of the system—for information about a keyholder who could gain access to her home in the event the doors were locked.

8

No. 60 (on file with the Court). Greenig answered the questions that the 911 operator asked about Lewis's name, address, callback number, and whether Lewis was in a house, an apartment, or a business. Greenig reported that Lewis "said that she's having trouble breathing," and the 911 operator responded, "I'll get somebody out there." *Id.* Greenig had not asked Lewis if gaining entry to the home would be a problem, so Greenig did not know (and thus did not inform the 911 operator) that Lewis was home alone with the doors locked. At 11:45:35 A.M., Greenig logged "Agency dispatched." Detailed Activity Report 1.

At 11:45:36 A.M., Greenig switched back to the two-way communication system with Lewis, but Greenig could not hear Lewis. Greenig stayed connected to the two-way communication system with Lewis, but she did not report to Columbus 911 that she had lost contact with Lewis. According to a 911 supervisor, if a 911 operator had been notified that Greenig had lost contact with Lewis, the 911 operator would have told the dispatcher to send a fire truck immediately. Wilder Dep. 82:10-16, ECF No. 69.

Columbus 911 dispatched an ambulance to Lewis's home at 11:46:19 A.M. Emergency medical personnel arrived on the scene at 11:50:39 A.M., but by 11:53:18 A.M., the EMS team reported to the 911 operator that they had tried both doors and nobody answered. The 911 operator tried to call Lewis three times, but there was no answer. Upon learning that the 911 operator could not reach Lewis,

9

a paramedic requested a fire engine to gain entry to the house. Columbus 911 dispatched a fire engine at 11:58:41 A.M. The fire crew arrived on the scene at 12:02:01 P.M.

Meanwhile, Greenig stayed connected to Lewis's two-way communication system until just after noon, even though she had lost contact with Lewis approximately fifteen minutes earlier. At 12:00:15 P.M., Greenig called Columbus 911 back and was told that an ambulance was on the scene. Greenig disconnected from the two-way device at 12:00:27 P.M. At that point, Greenig began contacting Lewis's emergency contacts. She reached Lewis's granddaughter, Tiffany Brown but was unable to reach Lewis's son, Eric Brown.

A firefighter was able to enter the home through a bedroom window. He found Lewis lying on the floor, still breathing and trying to talk to him. The fire fighter unlocked the door and let in the paramedics, who began to render aid to Lewis between 12:08:57 P.M. and 12:13:00 P.M. *Compare* MedScope Mot. Summ. J. Ex. T, 911 Call Recording, Columbus PD054 Track 42, ECF No. 60 (on file with Court) (reporting at 12:08:57 that CPR was in progress for "female patient"), *with* Pl.'s Resp. to Defs.' Mot. Summ. J. Ex. 8, Patient Care Report 1, ECF No. 79-10 (estimating that paramedics were "at patient" at 12:13 P.M.). Lewis went into cardiac arrest. After several minutes of CPR, Lewis regained a pulse and was transported to a hospital. She died three days

10

later. According to Plaintiff's medical expert, if the paramedics had been able to reach Lewis and render aid to her when they first arrived on the scene (instead of between eighteen and twenty-three minutes later), Lewis's cardiac arrest could have been avoided.

## DISCUSSION

Defendants seek summary judgment on all of Plaintiff's claims. The Court addresses each claim in turn.

### I. Fair Business Practices Act Claim

Plaintiff asserts that MedScope violated Georgia's Fair Business Practices Act, which is intended "to protect consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of any trade or commerce." O.C.G.A. § 10-1-391(a). The Act only regulates acts in the "consumer marketplace." *Lynas v. Williams*, 454 S.E.2d 570, 573 (Ga. Ct. App. 1995). "In analyzing whether a defendant's allegedly wrongful activities are in violation of the [Act] to protect the public or an 'isolated' incident not covered under the statute," there are two determinative factors: "'(a) the medium through which the act or practice is introduced into the stream of commerce; and (b) the market on which the act or practice is reasonably intended to impact.'" *Zeeman v. Black*, 273 S.E.2d 910, 915 (Ga. Ct. App. 1980) (quoting *State ex rel. Ryles v. Meredith Chevrolet, Inc.*, 244 S.E.2d 15, 18 (Ga. Ct. App. 1978)). "Clearly, offering a product for sale by opening one's door to the general public triggers the

prohibitions of the [Act] if a deceptive act or practice is involved." *Marrale v. Gwinnett Place Ford*, 609 S.E.2d 659, 664 (Ga. Ct. App. 2005).

MedScope argues that it did not offer its medical alert systems for sale to the general public and that it only sought to reach healthcare case managers with its internet advertising. MedScope also hints that there was no transaction in the consumer marketplace here because Lewis did not pay MedScope directly for the alert system—her Medicaid benefits did. But a reasonable juror could certainly conclude that MedScope publicly advertised its services through YouTube and its website. A reasonable juror could also conclude that the advertisements were not restricted to case managers but instead contained language targeted to potential subscribers. And a reasonable juror could conclude that Lewis relied on the advertisements in deciding to subscribe to the MedScope alert system using her Medicaid benefits. Thus, genuine fact disputes preclude summary judgment on this ground.

MedScope contends that even if its advertising and sale of Lewis's device occurred in the consumer marketplace, there was no deception as is required to state a claim under the Act and no reasonable reliance on any alleged deception. There are genuine fact disputes on these issues too. A reasonable juror could conclude from the YouTube video and the FAQs that MedScope represented that:

12

(1) MedScope's operators are 911 certified. MedScope FAQs 2 ("Calls are answered by *our* 9-1-1 certified response operators who dispatch help as needed." (emphasis added)).[4]

(2) MedScope's medical alert system was at least substantially similar to the public 911 service and that it was actually better suited to the needs of disabled persons than traditional 911 services because a subscriber just had to push a button to get help.

(3) With the push of a button, the subscriber would be connected to a 911 certified operator who would obtain the necessary information from the subscriber and call for local first responders to be dispatched.

(4) MedScope's operators would respond to an emergency call in a manner that reasonably ensured that the subscriber would receive medical assistance in a reasonably prompt manner—at least as quickly as if the subscriber had dialed 911 instead.

A juror could also find that Lewis reasonably relied on these representations in electing to subscribe to the MedScope alert system. And a juror could find that these representations were false because MedScope's operators were not 911 certified, did not obtain the necessary information from the subscriber or properly triage the subscriber's needs, did not properly respond to the loss of contact with the subscriber, and did not respond to the emergency call in a way that was calculated to ensure the subscriber received prompt medical attention. Finally, a juror could conclude that MedScope's false representations contributed to Lewis's death.

---

[4] MedScope may argue to the jury that this language really means the subscriber's local 911 operators, but that is not the only reasonable interpretation of the representation.

13

For these reasons, the Court denies MedScope's summary judgment motion on the Fair Business Practices Act claim. Because Plaintiff's Fair Business Practices Act claim survives, Plaintiff's claim under the Unfair and Deceptive Practices Towards the Elderly Act must also survive. *See* O.C.G.A. § 10-1-851 (providing for liability if Fair Business Practices Act violations involve elderly or disabled individuals).

## II.  Negligence Claims

Plaintiff claims that MedScope and AvantGuard were both negligent and that their negligence caused Lewis's death. Defendants argue that they did not owe any duty to Lewis outside the contractual duties contained in the subscriber agreement. "Although a breach of contract does not always give rise to an action for negligence, such an action will lie 'if in addition to violating a contract obligation [the breach] also violates a duty owed to plaintiff independent of contract to avoid harming him.'" *Anderson v. Sears Roebuck & Co.*, 664 S.E.2d 911, 914 (Ga. Ct. App. 2008) (alteration in original) (quoting *Orkin Exterminating Co. v. Stevens*, 203 S.E.2d 587, 590 (Ga. Ct. App. 1973)). An independent duty "may be found because of the relationship between the parties, or because of defendant's calling or because of the nature of the harm." *Stevens*, 203 S.E.2d at 590. Generally, "[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the

14

protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking." Restatement (Second) of Torts § 323 (Am. L. Inst. 1965); *accord id.* § 324A (explaining rule on liability to third person for negligent performance of an undertaking).

As discussed above, a reasonable juror could find that Lewis, a disabled person, relied on MedScope's representation that it would provide emergency services that were at least as good as those she would receive by calling 911 directly. Lewis subscribed to MedScope's medical alert system, which she believed would allow her to receive emergency medical treatment without calling 911 even if she were home alone. Lewis activated the device instead of calling 911. AvantGuard answered the call for MedScope. Lewis told the AvantGuard operator that she could not breathe. When the AvantGuard operator lost contact with Lewis, she did nothing to notify 911 or Lewis's contacts of this situation for fifteen minutes, even though a juror could conclude that a 911 operator who lost contact with a caller who can't breathe would have told the dispatcher to send a fire truck immediately. As a result, the paramedics' ability to render aid to Lewis was delayed by between eighteen and twenty-three minutes. For these reasons, the Court

15

is satisfied that genuine fact disputes exist on whether (1) Defendants owed Lewis a duty of care by assuming responsibility for providing her with necessary emergency service, (2) Lewis relied on Defendants' assumption of that duty, and (3) Defendants breached that duty and caused harm to Lewis.

Defendants argue that even if there are genuine fact disputes on Plaintiff's negligence claim against them, the contractual limitation of liability provision is enforceable under Georgia law and applies to limit damages.[5]  That provision states:

> The Subscriber . . . agrees that if loss, damage, or injury to . . . any person . . . on the premises should result from the improper installation or servicing or from the failure of the PERS or any of its options to operate properly irrespective of cause or origins, the liability, if any, of MedScope shall be limited to Two Hundred Fifty ($250.00) Dollars as *liquidated damages*/limitation of liability.

MedScope Agreement 2, ECF No. 79-12 at 4 (emphasis added).

In Georgia, limitation-of-liability "clauses in which a business seeks to relieve itself from its own negligence are valid and binding . . . 'and are not void as against public policy unless they purport to relieve liability for acts of gross negligence or

---

[5] In a footnote, AvantGuard pointed out that the subscriber agreement states that it shall be governed by the laws of Pennsylvania, though AvantGuard's main argument is that the clause is enforceable under Georgia law.  Georgia courts do not enforce choice of law provisions if application of the clause would contravene a strong public policy of Georgia.  *Belt Power, LLC v. Reed*, 840 S.E.2d 765, 770–71 (Ga. Ct. App. 2020).  So, even if Pennsylvania allows a business to contract around its own gross negligence that causes personal injuries, Georgia has a strong public policy of not allowing such a contract.

16

wilful or wanton conduct.'"  *Monitronics Int'l, Inc. v. Veasley*, 746 S.E.2d 793, 802 (Ga. Ct. App. 2013) (quoting *Holmes v. Clear Channel Outdoor, Inc.*, 644 S.E.2d 311, 314 (Ga. Ct. App. 2007)). Here, a reasonable juror could conclude that Defendants' conduct amounted to gross negligence, thus precluding application of the limitation-of-liability clause.  Moreover, MedScope chose to categorize the $250 limit as "liquidated damages" in its own contract.  A liquidated damages provision is only "enforceable if '(1) the injury caused by the breach is difficult or impossible to estimate accurately; (2) the parties intended to provide for damages rather than a penalty; and (3) the sum stipulated is a reasonable pre-estimate of the probable loss.'"  *Browne & Price, P. A. v. Innovative Equity Corp.*, 864 S.E.2d 686, 690 (Ga. Ct. App. 2021) (quoting *Crown Series, LLC v. Holiday Hosp. Franchising, LLC*, 851 S.E.2d 150, 153 (Ga. Ct. App. 2020)).  The last element is clearly not met here.  For these reasons, the Court finds that the limitation-of-liability clause does not limit Plaintiff's claim.

MedScope also contends that the negligence claim against it should be dismissed because, in its view, the claim is based solely on AvantGuard's conduct.  MedScope acknowledges that its subscriber agreement with Lewis permitted MedScope to appoint an "agent" to "perform its monitoring service obligations." MedScope Agreement 2, ECF No. 79-12 at 4.  MedScope argues, though, that

17

AvantGuard was an independent contractor, and Georgia law limits when an employer is liable for the negligence of a contractor. *See* O.C.G.A. § 51-2-4 ("An employer generally is not responsible for torts committed by his employee when the employee exercises an independent business and in it is not subject to the immediate direction and control of the employer."). But an employer "is liable for the negligence of a contractor" if "the wrongful act is the violation of a duty imposed by express contract upon the employer." O.C.G.A. § 51-2-5(3). Here, MedScope had an express contractual obligation to provide monitoring services for Lewis's personal emergency response system, as well as an express contractual obligation to "use reasonable efforts to orally notify the appropriate emergency agency or other persons designated on the Client's Subscriber forms, by telephone, advising of the existence and nature of such signal." MedScope Agreement 2, ECF No. 79-12 at 4. As discussed above, a juror could conclude that neither MedScope nor AvantGuard properly triaged Lewis's needs, responded to the loss of contact with Lewis, or responded to Lewis's call in a way that was calculated to ensure that Lewis received prompt medical attention. Thus, a juror could reasonably conclude that MedScope and AvantGuard failed to use reasonable efforts to notify the appropriate emergency agency of Lewis's need for assistance. Summary judgment is denied on this ground. The Court also finds that the facts viewed in the light most favorable

18

to Plaintiff preclude summary judgment on Plaintiff's claim for punitive damages and his claim under O.C.G.A. § 13-6-11.

CONCLUSION

As discussed above, the Court denies the pending summary judgment motions (ECF Nos. 52 & 57). The motion for a hearing (ECF No. 58) is terminated as moot. The Court will rule on Plaintiff's motion in limine (ECF No. 95) once it is fully briefed and ripe for review. The Court intends to try this action during the March 2024 trial term, which begins on March 4, 2024. The Court will send a notice of pretrial conference later this year.

IT IS SO ORDERED, this 29th day of August, 2023.

S/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA